OTTO E. LINDBURG, APPELLEE, V. JOHN R. BENNETT ET AL., APPELLANTS.

FILED MAY 28, 1928. No. 25640.

*Hainer, Flansburg & Lee, Peterson & Devoe, Max G. Towle, A. Farley Young, George I. Craven* and *C. J. Campbell,* for appellants.

*Clark Jeary, Clarence G. Miles* and *J. C. McReynolds, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, and THOMPSON, JJ., and LANDIS, District Judge.

GOSS, C. J.

This is an equity suit in which the district court decreed that a 99-year lease of certain real property made by the county to two of the individual defendants was invalid. The county and the lessees appealed.

The suit to enjoin the performance of the lease was brought by a taxpayer, who alleged, in substance, that the county of Lancaster has long owned in fee lots four (4), five (5) and six (6), block ninety (90), Original Plat to the city of Lincoln, and that said property is commonly

known as the "City Auditorium;" that on July 7, 1925, the defendant county commissioners entered into a written lease of said premises for the term of 99 years with the defendants O'Shea and Rogers; that the same is in effect a sale of said premises, that such a sale cannot be made without a vote of the electors of the county, but that the matter has never been submitted to such a vote. Plaintiff prayed for an injunction preventing the lessees from entering upon the premises and for a decree declaring the acts of the county commissioners void and quieting the title in the county. The defendants, O'Shea and Rogers, answered, alleging that the county took the lots as part settlement of the shortage of a county treasurer in 1896, has ever since held the fee simple title, has, on occasions specified in the answer, leased the premises to other parties, with the history thereof, that it was leased to these answering defendants as shown by the copy of the lease attached to the petition, that they intend to carry out the provisions of the lease, and praying for a dismissal. Lincoln Post No. 3 of the American Legion, hereinafter called the Legion, as intervening defendant and cross-petitioner, pleaded that on February 19, 1925, the county, "the same not being its public grounds," leased the premises to it for a term of five (5) years from August 13, 1924, that the written lease gave the Legion a valid option during its term to buy the property at the price and on the terms of any contemplated sale to other parties, that it elected to exercise its option to take over the property on the terms of the O'Shea and Rogers "contemplated sale," as described in the petition, that the county commissioners and others seek by fraud and collusion to avoid cross-petitioner's contractual rights, and prayed specific performance of its option agreement. The Legion's pleading included W. Bruce Shurtleff and Charles Olson in its title as defendants and so refers to them in the body of the cross-petition, but we are unable to discover from the transcript in what manner they were made actual and formal parties to the suit in the lower court, but they participated as defendants in some of the

pleadings; and the amended præcipe filed by appellants lists them as defendants, as does also the præcipe of the cross-appellant Gee. George S. Gee also intervened somewhere along the line, also not shown by the transcript, as a citizen and taxpayer, in opposition to the O'Shea-Rogers lease. He alleged, among other things, that the real estate in question has become and is public grounds and cannot be sold or otherwise disposed of without a vote of the electors, alleged collusion to prevent bidding and competition, and prayed either that the Legion's prayer for a right to purchase under its option be confirmed, or that the O'Shea-Rogers agreement be declared void. The county commissioners answered separately, setting up the acquirement of the property, the history of its uses and income, that the property was never used for governmental purposes, that the lease to O'Shea-Rogers was expressly made subject to the existing lease of the Legion and is not a sale of the property, and prayed a dismissal. The foregoing merely sketches the main points of the voluminous pleadings in order to give a view of the issues as raised by the various parties.

A brief history of the case, condensed from the extended evidence, will help us to diagnose the case and will aid the reader to understand it. On March 24, 1896, a shortage of $36,000 was discovered in the official accounts of one who was then and for some time had been treasurer of Lancaster county. Soon thereafter he died. The claim of the county against his estate was allowed in full. Suit was brought in the district court against the bondsmen of the treasurer, naming also the representative of his estate as a defendant, to recover the shortage, and a settlement was made, with the approval of the county court, by which notes held by the treasurer and secured by mortgage on the lots in question were turned over to the county. Thereupon, and as a part of the settlement, the holder of the title conveyed the lots to the county, to satisfy his debt evidenced by the notes and secured by this mortgage. In the settlement the liability of the estate on the short-

age was credited in the sum of $13,546.56, which was the agreed value of the notes for the purpose of settlement. The county obtained a fee simple title by which it has ever since held and still holds the lots. The county has never used this real estate for any purpose other than to lease it for whatever revenue it could obtain in the ways hereinafter set forth. On September 5, 1899, the county executed a written lease, with the Lincoln Auditorium Association as lessee, to run 25 years from September 1, 1899, by the terms of which the lessee agreed to erect upon the lots an auditorium seating 3,400 people, at a cost of $15,000, to pay all special taxes, to furnish the auditorium free for all county and district political conventions and at cost to all city political conventions, to share equally with the county the net profits, divisible each three years, and at the end of the term all buildings, improvements and fixtures were to be turned over to the county, free of incumbrance. There were no profits and, the county consenting, the lease was surrendered in writing on February 20, 1903. On February 19, 1903, the county commissioners leased the premises to the Union Commercial Club for 50 years at $350 a year, the county board having on the same day, by a resolution, decided that the property was worth $8,000 and that the rental named would produce a higher rate of income than the county had to pay on bonds for borrowed money. The written lease provided that the club might erect on the premises a brick building for the use of the Commercial Club and at the termination of the lease the brick building, the auditorium, and all other buildings constructed on the premises by the lessee, its successors or assigns, should remain the property of the lessee and be removed. In 1904 the Union Commercial Club transferred this lease to the Lincoln Commercial Club. In 1919 the Commercial Club made a settlement with the county on account of its unpaid rent, and, by resolutions both of the county and of the club, the lease of 1903 was canceled. On August 13, 1919, the county leased the property in writing to the city of Lincoln for

the term of five years, at an annual rental of $350. On February 19, 1924, the county of Lancaster leased the premises in writing to Lincoln Post No. 3, American Legion, of Lincoln, Nebraska, for the term of five years from August 13, 1924, at a rental of $350 a year, to be paid on February 1 of each year, the lessee to pay all special taxes or assessments before delinquency. The lease contained, among other things, this provision:

"It is further agreed that the party of the first part (the county) shall have the right to sell the premises herein described, provided, however, that notice of such contemplated sale shall be given in writing to the party of the second part (the Legion) at least one year prior to the time fixed for the vacation of said premises by the party of the second part, and provided, further, that during such period the party of the second part shall have option to itself take over and buy the premises at the price and on the terms of such contemplated sale."

An examination of all the leases of this property ever made by the county prior to the one in suit shows that they all contained reservations of permission to use the premises by political conventions and that none of them required the payment by the lessees of any general taxes. The evidence shows that the gross rentals received from the property from the time it was acquired in 1896 up to July 7, 1925, amounted to $5,954.60, and during that period the amount paid out on account of the property a total of $928.50. It may be remarked that the spirit of the leases, and the uses for which they required the property to be reserved in part, did not look toward revenue as a main end. On July 7, 1925, the county, by its commissioners, leased said premises to the defendants, E. M. O'Shea and R. H. Rogers, for a full term of 99 years, beginning on the 7th day of July, 1925 (subject to the Legion lease, which will expire August 13, 1929), for a yearly rental of $4,000 from and after the expiration of the Legion lease. The written lease was duly executed and acknowledged by all parties thereto and was filed, all on

July 7, 1925. The lessees covenanted to pay all rates, taxes and assessments of every kind, that on or before 18 months after the expiration or termination of the Legion lease they would commence the construction of a modern fireproof building upon the premises, at least two stories in height, with foundations capable of sustaining a building eight stories in height, the building to be completed not later than one year after the commencement thereof, and to cost not less than $100,000, and to furnish a $25,000 bond to be approved by the county to insure the commencement and erection of said building. The lease is too long to abstract, but it contains the modern conventional provisions of 99-year leases. It may be noted that it contains no revaluation clause. It was made after wide publicity had been given the consideration of the matter through the newspapers and otherwise. The evidence shows that the proposed lease was widely discussed in the daily papers of the city both editorially and as news and that one of them published the proposed lease in full. It was the best offer, and apparently the only actual offer, received up to the time of the execution and delivery of the lease.

At the conclusion of the trial before the court, the court found that the county commissioners were without power to enter into the 99-year lease; that the contract is *ultra vires* and void; that the premises are public grounds belonging to Lancaster county within the meaning of the statutes; that the question of entering into said contract has never been submitted to a vote of the electors; that there was no fraud or concealment on the part of the county commissioners and that the consideration for the lease was not so inadequate as to amount to fraud; that there was no fraud in the conduct of the defendants O'Shea and Rogers and Shurtleff and Olson, and that there was no fraud or conspiracy against the Legion to deprive it of its rights under the option contained in its lease. The decree of the court canceled the lease, denied the prayer of the intervener, the Legion, for specific performance, and gave

a judgment for costs in favor of the interveners Gee and the Legion.

The appellants assign that the court erred (1) in holding that the property constituted public grounds and buildings, as distinguished from real estate of the county, within the meaning of the statutes; and therefore erred (2) in holding that the county commissioners had no authority to enter into a lease without a vote of the electors; (3) in holding that the county could not lease this property for 99 years; and (4) in holding that the 99-year lease was a sale or equivalent to a sale under the statute.

At the outset of the discussion, it may be set down that, like the trial court, we find nothing in the evidence to support any charge of active fraud, collusion or conspiracy on the part either of the county commissioners or of the lessees and their associates, or of their attorneys, all of whose conduct, either directly or by implication, is sought to be impugned in some connection or another in briefs and arguments by some of the parties. There appears no unlawful combination or confederation to deprive the county of title to its property or to interfere with the rights of the Legion in the premises. The lessees were seeking a desirable investment and the improvement of this property as an enhancement to their valuable improved property adjoining this on the east, as they had a right to do. The county, through its commissioners, was seeking some use of this property, so long held with meager returns, that would produce a net income commensurate with its value, as it had the right to do. If its commissioners acted within their powers and without fraud, conspiracy or collusion, then the courts cannot and will not interfere and substitute the judgment of the court for the thus exercised discretion of the commissioners. The inquiry here is as to whether they acted within their powers in making the 99-year lease.

So much of the general sections of the statutes as are involved are quoted in this paragraph:

"Each county which has heretofore been, or may here-

after be established in this state, according to the laws thereof, shall be a body politic and corporate." Comp. St. 1922, sec. 848. "Each county shall have power: First. To purchase and hold the real and personal estate necessary for the use of the county, and to purchase and hold for the benefit of the county, real estate sold by virtue of judicial proceedings in which the county is plaintiff or is interested * * * Second. To sell and convey, or lease, any real or personal estate owned by the county. Third. To make all contracts and do all other acts in relation to the property and concerns of the county necessary to the exercise of its corporate powers." Comp. St. 1922, sec. 851. "The powers of the county, as a body corporate politic, shall be exercised by a county board." Comp. St. 1922, sec. 850. A county board has the power: "First. To take and have the care and custody of all the real and personal estate owned by the county." And "Third. * * * To sell the public grounds or buildings of the county, and purchase other properties in lieu thereof." Comp. St. 1922, sec. 852. "Public Grounds. Sale. The county board shall not sell the public grounds as provided in the third subdivision in the preceding section without having first submitted the question of selling such public grounds to a vote of the electors of the county: Provided, in any case where the county has acquired real estate at a cost not to exceed one thousand dollars ($1,000) by gift, purchase or judicial proceedings in which the county is plaintiff or is interested, the county board may sell such real estate without submitting the question to a vote of the electors of the county." Comp. St. 1922, sec. 853, as amended March 31, 1925, Laws 1925, ch. 95, sec. 1. This amendment was in effect when the lease under examination was made.

The appellants argue, from these statutes, in substance, that a county has two qualities or characteristics: First, governmental or politic; and, second, private or proprietary; that such lands and buildings as are necessary to use for the purpose of carrying on the business of the county

are used in its governmental capacity, are therefore described in the statutes as "public grounds and buildings" and cannot be sold and conveyed without a vote of the electors; while such real estate as is acquired and held as an asset of the county, but not for physical and governmental use, is held in its private or proprietary capacity, and may, under section 851, aided by following sections, be sold and conveyed by the county board in the exercise of its judgment and discretion without a vote of the electors. They concede that a courthouse and grounds and a poor-farm are public grounds and buildings, but assert that real estate taken in settlement of a debt, as this was, and not used by the county in the exercise of any governmental function, is held under proprietary powers. On the other hand, the appellees contend that all such property costing over $1,000 is public grounds and buildings, and cannot be sold without a vote of the electors. They further insist that the 99-year lease of the property in question is equivalent to a sale thereof.

The appellants cite a previous case in this court, involving a 50-year lease of this identical property, as binding authority that this is not public grounds and buildings and that there is no limitation on the powers of the county board to make the lease. *Lancaster County v. Lincoln Auditorium Ass'n*, 87 Neb. 87. We find ourselves unable to accord with the expressed views of appellants as to the present effect of that case for two reasons: First, the opinion by Judge Letton shows (page 92) that the parties there agreed that the lots "were not 'public grounds' of the county, and that the board of county commissioners had the power, without first submitting the question to a vote of the electors of the county, to enter into the first lease, and afterwards, with the consent of the lessee, to cancel and set aside the same and release the property for the term of 50 years," so that case was considered and decided on other grounds than those under consideration here; and second, when that case was up in 1910, the legislature had not amended section 853, as heretofore shown

it did in 1925, so as to give at least some indication of legislative policy as to what lands owned by a county may not be sold by the county board without the authority of a vote of the electors.

Appellants assert that the phrase "body politic and corporate" as found in sections 848 and 850 is indicative of two distinct powers or qualities found in counties; that when the members of the county board deal with governmental matters they are acting as agents of the county in exercising its functions as a "body politic," but where they deal with other matters they act as agents of the county in exercising its functions as a "body corporate." Specifically they apply their theory and definitions here by saying that such lands as the county holds for the actual use of the county, like the courthouse and grounds and the poor-farm and buildings, it holds in its governmental capacity as a "body politic" and such are therefore "public grounds and buildings;" but such "lands" as the county otherwise holds, it holds as a proprietor in its corporate capacity as a "body corporate." From historical sources of the derivation of the term "body politic and corporate," as applied to a county, and from the term itself, we do not find support for splitting up the phrase. It is conjunctive rather than disjunctive.

In 2 Coke, Littleton, sec. 413, the learned author, in discussing bodies politic and corporate, says: "This is a body to take in succession, framed (as to that capacity) by policie, and thereupon it is called here by Littleton a body politike; and it is also called a corporation, or a body incorporate, because the persons are made into a body, and are of capacity to take and grant, etc. And this body politike, or incorporate, may commence, and be established three manner of ways, viz., by prescription, by letters patented, or by act of parliament."

"Bodies *politic and corporate* had been known to exist as far back at least as the time of Cicero; and Gaius traces them back even to the laws of Solon of Athens, who lived

some five hundred years before." *Warner & Ray v. Beers,*
23 Wend. (N. Y.) 103, 122.

The definition of "body politic" found in the preamble
of the Massachusetts Constitution is widely quoted. "The
body politic is formed by a voluntary association of in-
dividuals; it is a social compact, by which the whole people
covenants with each citizen and each citizen with the whole
people, that all shall be governed by certain laws for the
common good." While the definition was prescribed for a
commonwealth, the principle is quite applicable to the body
of the people set apart in a county or a city to be a state
agency or a unit for the purpose of certain local govern-
mental functions.

That a county, even though a body politic and corporate,
is a creature of statute and has only such powers as the
legislature has conferred upon it is almost axiomatic.
These powers are executed by the county board. The board
of county commissioners has such powers as are specific-
ally conferred on it by statute and such other incidental
powers as are necessary to carry into effect the powers ex-
pressly granted. *Lancaster County v. Green,* 54 Neb. 98;
*Berryman v. Schalander,* 85 Neb. 281. So it is more of
an academic question here as to whether the county holds
any certain real estate as a proprietor in a corporate ca-
pacity or as to whether it holds it in its governmental ca-
pacity. The question arises rather when it seeks to make
disposition or use of property, whether the legislature has
clothed the county board with the power, in the particular
instance, to execute what they conceive to be within their
functions. It is true that, where county real estate is
devoted to actual public use, it has attached to it a govern-
mental character or quality such as to cause it to be dis-
tinguished as public grounds; and where it is not used
for such public purposes the county might well be said to
hold it as a proprietor. In other words, we are of the
opinion that, when a county holds or undertakes to dis-
pose of any of its lands, the measure of its powers is not
found solely in the inherent character of the lands, but

rather in the statutes giving the power to hold, and the power to make disposal, and in the general rules of law if and where the statute is not otherwise restrictive. In this connection, the appellees cite a suit brought against the county commissioners of Douglas county to compel them to provide rooms in the county courthouse for the municipal court of the city of Omaha, where it was laid down as the law applicable to such a situation that "A county does not possess the double governmental and private character that cities do. It is governmental in character only, and in that capacity acts purely as an agent of the state." *State v. Board of County Commissioners,* 109 Neb. 35. There the learned judge was writing an opinion involving county real estate in the form of a courthouse and grounds, but he was describing the character of the county rather than the character of the property. That the county acts purely as an agent of the state, as was there declared, is support for what we are saying here. Had lands like those of the instant case been involved, that opinion might well have given the same description of the character of a county and applied the same rule that, as the opinion said in direct connection with what we have quoted from it: "Property of the county, acquired by funds raised through taxation, is property of which the state can direct the use, management and disposition, so long at least as this is done for the benefit of the public."

The second subdivision of section 851 gave the county power "to sell * * * any real or personal estate owned by the county;" not only did section 850 say that the powers of the county should be exercised by the county board, but the third subdivision of section 852 gave the county board the power "to sell the public grounds or buildings * * * and purchase other properties in lieu thereof;" and section 853, while originally prohibiting the sale of "the public grounds as provided in the third subdivision of" section 852 without a vote of the electors, yet, as the legislature amended section 853 in 1925, and as that amended section was worded when the lease under consideration was made,

if there previously was any distinction between the "public grounds" of a county and the "real estate" of a county, costing less than $1,000, so far as the right of the commissioners to sell it without a vote of the electors is concerned, that act of the legislature, heretofore quoted, seems to have done away with the distinction. Real estate acquired "by gift, purchase or judicial proceedings" (section 853, as amended) covers all the conceivable ways in which any one may become the owner of real estate. In its most enlarged sense, "purchase" alone includes all lawful acquisition of real estate by any means whatever except by descent. *Watson v. Donnelly & Lynch*, 28 Barb. (N. Y.) 653, 658 (quoting 2 Blackstone, 241); *City of Enterprise v. Smith*, 62 Kan. 815; Tiedeman, Real Property (2d ed.) 659. The county acquired the Auditorium property by purchase. It might be said to have acquired it by judicial proceedings in the settlement of a law action. It cost more than $1,000. The amended statute expressly says it cannot be sold without a vote of the electors. Therefore, we are of the opinion that since section 853 was amended and the amendment became effective three months after the act was approved on March 31, 1925, a county board has no power to sell any real estate owned by the county and costing over $1,000, without a vote of the electors of the county. The legislature has indicated its policy on that subject by placing a limitation on the sale measured by the cost value of the land; and by including all real estate owned by the county in its restrictions of sale. We cannot interpret it otherwise without invading the constitutional department of our state government belonging to the legislature.

The next question to consider is the power of a county board to lease real estate acquired and owned by the county. The distinction between selling and leasing real estate is so well known that it needs little or no discussion. "A lease transfers to the lessee an interest in the realty less than the estate of the lessor, and as a result of such transfer the lessor has a reversion in such realty, while a con-

tract between the vendor and purchaser for the sale of realty binds the vendor to transfer to the purchaser the interest in such realty which the vendor possesses." 39 Cyc. 1175. By section 851 the legislature expressly gave to each county in the state, along with the power of sale, the power to lease any real estate owned by the county; and by section 852 it delegated to the county board the power to take and have the custody of all the real estate owned by the county and to manage the county funds and business except as otherwise specifically provided. We do not find, and counsel have not pointed out to us, any express or specific provisions limiting the powers of the county board as to the leasing of county real estate, though, as we have seen, the legislature has placed express and specific limitations on the powers of the county board as to the selling of county real estate. This would seem to indicate a legislative policy to leave to the county board power to lease such real estate as originally granted in the sections of the statute to which we have referred. Section 853 as amended cannot be said to repeal by implication the power to lease, because it does not treat of leasing in any respect whatever. We see no escape from the conclusion that, under the powers given the county board by statute, the board has the general power to lease real estate owned by the county. We do not wish to be understood that this rule is absolute; but that, if it be honestly exercised, without injury to the uses, interests and welfare of the county, the discretion of the board in leasing county real estate will not be enjoined by the courts.

This leads us to the inquiry as to the effect of a 99-year lease. Is it the equivalent of a sale? The appellees assert that it is and therefore is prohibited by amended section 853. They cite *Fawn Lake Ranch Co. v. Cumbow,* 102 Neb. 288, which arose in the potash era of the World War. The company had school land leases of a section of school land. It sought to enjoin the defendants from trespassing and removing the mineral waters from a lake on the land. The defendants answered, setting up a lease from the

commissioner of public lands and buildings, granting for three years the right to enter upon and occupy the premises "for the purpose of prospecting for minerals, petroleum, gas, potash, or other valuable substances." The trial court refused an injunction, but this court reversed the judgment of the district court because the plaintiff was entitled to the use of the school lands under its leases and because the legislature had never conferred "upon the board power to vest others with the right to enter upon the lands and remove the minerals therefrom." It is true the court concluded that the lease was a chattel real, and the minerals sought to be removed, being defined in the statute as real estate, must be considered in that light. To allow them to be removed under the defendants' mineral lease would not only be waste and thus violative of the terms of the school land leases of plaintiff but would be equivalent to allowing real estate to be sold. As we understand the decision, it does not attempt to distinguish between a lease and a sale generally, but holds that, without express authority from the legislature, the board has no power to execute such a lease as the one there under consideration.

The various appellees, in numerous briefs, cite too many cases to make it possible to take up and discuss them separately. But this is the substance of their argument to convince that the lease in question results in a sale and conveyance of the property: Under section 5586, Comp. St. 1922, defining "real estate," the lease, being for more than one year, is a chattel real and therefore real estate; under section 5587, defining "purchaser," the appellants are purchasers because an interest in real estate is conveyed to them for a valuable consideration; under section 5588 the lease in question is a deed assigning an interest in real estate; therefore, by the lease, the real estate is sought to be sold to the appellants. The main Nebraska case, construing these sections, cited by appellees and discussed at length in several of the briefs, is *Fawn Lake Ranch Co. v. Cumbow*, 102 Neb. 288, 297. After discussing the above sections and deciding that the lease in

question is a "chattel real" and is therefore real estate and not personal property, as a chattel real is personal property in some states, the opinion proceeds immediately to say: "Whatever view may be taken in some states with reference to the nature and character of such an instrument and of the right to remove minerals from the land, the legislative definition prevails, and the property must be considered as real estate. Without express authority from the legislature, the board has no power to execute such a lease as the one under consideration." The case so much relied upon by appellees, by these last quoted words, confounds their argument. In the instant case, the legislature, in express words of the statute, earlier quoted by us, gave the board authority to lease.

The appellees cite two cases from the supreme court of the state of Washington. There they have a provision in the state Constitution which (1) prohibits the ownership of lands by aliens (with exceptions and provisions not involved here) and which (2) provides that "all conveyances of lands hereafter made to any alien directly, or in trust for such alien, shall be void." In the first case, *State v. Morrison,* 18 Wash. 664, the court, considering a 99-year lease, after stating that it could not find any authority bearing directly upon the question, said: "We have concluded that a lease of lands in this state to an alien for a reasonable term might be upheld, but that the lease in question is for an unreasonable term, and consequently void." In the second case, *State v. Hudson Land Co.,* 19 Wash. 85, it was held that a lease of land to an alien for 49 years was void since it permitted that to be accomplished indirectly which could not be done directly. The decisions in these two cases were forced by the policy plainly expressed in the Constitution against any ownership of lands with the constitutional prohibition of "all conveyances of lands" to any alien. By reason of the constitutional provisions there, we do not regard these cases as applicable here, where our Constitution contains no such prohibition

and where our statute expressly allows the board to lease real estate owned by the county.

Other cases cited by the appellees, too numerous to analyze in this already extended opinion, find their answer in our statute law applicable to leases of county real estate.

A case very much like the instant case in its facts, and akin to it in the principles involved, arose in Chicago, and ultimately was reviewed in the supreme court. The Tribune Company had occupied under a lease three lots which were school property, the title to which was in the city of Chicago in trust. The company had improved the property with a building which it occupied for its business. The management of the property was vested in a board of education, subject to control by the legislature, and with powers defined by statute. The board had power to lease school lands. In May, 1880, the property was leased to the Tribune Company for 50 years. On June 15, 1888, the company and the school board entered into an agreement extending the lease to May 8, 1985. In 1907 the city of Chicago and the school board brought suit to cancel all the leases and agreements. On evidence and report of a master, the trial court dismissed the bill. Complainants appealed. The Illinois supreme court, in a well-reasoned opinion, affirmed the decree, holding that "A lease for a fixed and definite period, conditioned upon the payment of a fixed annual rental, even though for a long term of years, is a lease and not a sale, notwithstanding the language of the conveyance act and the act relating to judgments, which specifies that long-term leases shall be included within the term 'real estate.'" In the opinion, the court said:

"It is next argued that the leases, as extended until 1985, amounted to a sale of the property, which was beyond the power of the board of education, and the basis of the argument is that the terms were long. Reliance is placed upon the act in regard to judgments, which declares that leasehold estates, when the unexpired term exceeds five years, shall be included in the term 'real estate,' as used

in that act, and also upon the Conveyance act, as including leases like these. The question raised as to the nature or quality of a leasehold estate has little or nothing to do with the question whether these leases constituted a sale of the property. A decision that a lease for a long term is personal property or a chattel real, or real estate proper, would not affect the question whether the instrument is a lease or a sale. Words used in the statute are to be taken in their ordinary acceptation, and a lease, although for a long term, with payments of annual rent, is not a sale, which is a grant of absolute ownership. These leases were for a fixed and determinate period, conditioned upon the payment of fixed annual rental, and have all the characteristics of a lease and none of the features of a sale." *City of Chicago v. Tribune Co.*, 248 Ill. 242, 248.

The parties to that case, the statutes affecting it, and the principles of the common law applicable to it are such as to give it elements unusually common to the case at bar. The reasoning is cogent and is applicable here. On principle and on authority, without prolonging this discussion, we see no logical escape from the conclusion that the 99-year lease made by the county board was not a sale, but was in fact a lease.

The lease is conditioned upon the payment of an adequate annual rental with an agreement for valuable and permanent improvements to be made by the lessees who covenant to pay taxes and assessments of every kind. Upon failure of the lessees to perform its covenants the term ends. It contains no revaluation clause, but the evidence shows that this is not unusual in modern leases of this type. At the end of the term the improvements will belong to the lessor. There was no fraud in its procurement. It was a lease and not a sale and was made on behalf of the lessor within the authority of the law. When so made we cannot interfere with the powers of the board. To substitute our discretion for theirs would usurp functions not committed by the Constitution to the judicial department of our state government.

As a result, we deduce the following: A county board will not be enjoined from leasing, for a term of 99 years, real estate owned by the county but not actually used by it nor needed for its actual uses, where there is no fraud involved, where the consideration is adequate, and where the covenants and provisions of the lease protect the interests of the county. In such circumstances a 99-year lease is not equivalent to a sale of the property.

Having determined that the lease was made with authority and that it is not in effect a sale, it follows that the option of the Legion is ineffectual. It is an option to purchase if a sale be made. No sale being made, the option has nothing to operate on.

For the reasons stated, the judgment of the district court is reversed, with directions to enter a decree validating the lease as binding on all parties to the litigation.

REVERSED.